**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert L. ALLISON, Jr., Defendant–Appellant.**

No. 92–2642.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1995.

Decided June 30, 1995.

Stephen J. Liccione (argued), Stephen A. Ingraham, Asst. U.S. Attys., Office of the United States Atty., Milwaukee, WI, for plaintiff-appellee.

Thomas L. Shriner, Jr., Gerald M. Halfenger (argued), Foley & Lardner, Milwaukee, WI, for defendant-appellant.

Before CUMMINGS and RIPPLE, Circuit Judges, and WILL, District Judge.[1]

CUMMINGS, Circuit Judge.

Robert L. Allison was convicted by a jury of eight counts of mail and wire fraud and sentenced to 24 months in prison. He appeals his conviction and we affirm.

### Facts

Allison fleeced investors through two bogus investment schemes which he operated from 1986 to 1991 under the names New Design Financial Services and Northwest

---

1. The Honorable Hubert L. Will of the Northern District of Illinois is sitting by designation.

Development. In the first scheme, Allison promised investors—in a formal payout letter—a tenfold return on their $3000–$4000 investments. Allison promised to reap these extraordinary yields by investing his clients' money in Japanese yen. The money was "invested" instead in his girlfriend's checking account.

Allison touted his impressive "connections" with large corporations and the Canadian government. He told one investor that "the yen deal" was so big that no bank could handle it. He also claimed to be involved in a multi-trillion dollar transaction. He admitted at trial that that figure was more than eight times the United States gross national product. Needless to say, Allison's victims were not sophisticated investors and included a waitress, a homemaker, a paper-mill worker and a seamstress. When the promised payouts did not materialize, Allison would attempt to wheedle more money out of his victims "in order for the deal to go through" and would blame delays on attorneys, banks, travel problems and the complexity of the transactions. When all else failed, he would stop returning calls.

In addition to his "yen dealings," Allison promised to provide small business people with long term, low interest, no-collateral loans. After Allison deposited their advance fees in his girlfriend's account, no borrower ever received any loan money.

## Discussion

### I. Impeachment of defendant based on his refusal to meet with the FBI

■ The FBI twice contacted the defendant to discuss his financial dealings. Allison put off these requests and never met with the FBI. At trial, the government questioned Allison about his refusal to meet with the FBI in order to impeach his testimony that his dealings were all on the up and up. On appeal, Allison, relying on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91, argues that the government's references during cross-examination and closing argument to his refusal to meet with the FBI violated

due process and require reversal of his conviction.

■ *Doyle* and subsequent cases hold that it is fundamentally unfair and violative of due process for the government to comment on a defendant's post-arrest, post-*Miranda* silence. Allison's reliance on *Doyle* is misplaced, however, because he was never arrested and "the Fifth Amendment is not violated by the use of pre-arrest silence to impeach a criminal defendant's credibility." *Jenkins v. Anderson,* 447 U.S. 231, 238, 100 S.Ct. 2124, 2129, 65 L.Ed.2d 86. In attempting to salvage his argument, Allison claims, citing *United States v. Cummiskey,* 728 F.2d 200 (3rd Cir.1984), that even though he was never arrested, the government still had the burden of establishing that he had not been *Mirandized* [2] before they could comment on his potentially inculpatory silence and avoidance of the FBI.

*Cummiskey,* however, involved the government's comment on the defendant's silence *at the time of arrest.* The court immediately sustained the defendant's general objection which, the Third Circuit held, was sufficient to put the government on notice of the obvious *Doyle* problem. The government then had the burden under Fed.R.Evid. 104(b) of establishing the absence of a *Miranda* warning as a condition of fact on which relevancy of the post-arrest silence depended. Even in *Cummiskey,* the Third Circuit did not reverse the defendant's conviction but only remanded for a post-trial hearing to determine if a *Miranda* warning was given at the time of arrest.

In the present case, because the defendant was not taken into custody nor interviewed by the FBI before trial, there was no occasion at which a *Miranda* warning would have been given. The prosecutor, therefore, had no reason to believe that his comments raised a potential *Doyle* problem and thus no reason to elicit for the record the absence of such a warning. Moreover, though defense counsel objected several times, he did not raise a *Doyle* issue and unlike the post-arrest situation in *Cummiskey* where the required *Miranda* warning was presumably given, a general objection would not have been suffi-

---

**2.** See *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct.     1602, 16 L.Ed.2d 694 (1966).

cient to alert the prosecution to the alleged problem. Finally, defense counsel's initial objection, that the defendant had a constitutional right not to talk to the FBI, was not sustained: The court stated, "that's understood, Counsel. Proceed." At that point, if a real *Doyle* issue existed, it was up to the defense to bring it to the court's attention.[3] Fed.R.Evid. 103(a)(1). The government's failure to divine the "true nature" of Allison's objection and explicitly establish on the record the absence of a *Miranda* warning where neither the facts nor defense counsel's objections suggested that one was given, does not require reversal or remand.

Finally, Allison argues that even if there was no *Doyle* violation, the government nonetheless committed constitutional error when it commented on Allison's failure to meet with the FBI. Allison is mistaken. Where there is no arrest or *Miranda* warning, there is no due process violation. *Fletcher v. Weir*, 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982).

## II. Government's comments on defendant's veracity

■ Allison complains that the government improperly interjected its disbelief of the defendant's veracity during closing argument and rebuttal. Because defendant did not object to these comments at trial, we review only for plain error. *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir.1988). The government's comment at closing argument that defendant had not told the truth was a reasonable inference based on the inconsistency of the defendant's testimony with the other evidence and was not improper.[4] *Id.* at 466.

■ During rebuttal the prosecutor stated: "Whether Mr. Allison is a born liar or whether he just became one I'm not sure, but the fact of the matter is that that man is a liar." This statement was inappropriate and unnecessary. However, "[o]verdrawn rhetoric in making a legitimate point does not require a new trial." *United States v. Sblendorio*, 830 F.2d 1382 (7th Cir.1987). In light of the overwhelming evidence of guilt, this single intemperate comment was harmless and does not call into question the jury's verdict.

## III. Court's refusal to grant third continuance

■ Allison claims that the district court abused its discretion when it denied his mo-

3. The transcript shows that defense counsel never raised an objection which would have alerted the prosecution or the court to a *Doyle* issue:

> Q. The simple fact of the matter is, Mr. Allison, that you knew that [FBI] Agent Aziere made several attempts to try and sit down and talk with you. Isn't that correct?
> A. He made one, and one other appointment.
> Q. And you said you'd get back to him, right?
> A. I called him back and said I'd be in touch with my attorney.
> Q. And you never did get back in touch with him, did you?
> Mr. Milton: Objection, Your Honor, he didn't have to get back in touch with him. He has a constitutional right not to talk to him if he didn't want to talk to him.
> The Court: That's understood, Counsel. Proceed.
> Mr. Milton: Thank you, Your Honor.
>
> · · · ·
>
> Government:
> Q. And the bottom line is, until you hit the stand today—or, I'm sorry, yesterday, until you hit the witness stand yesterday, none of this that you've testified to has ever been made known to any representative of the government. Is that not correct, sir?

> Mr. Milton: Your Honor, he can't answer about everything—
> The Court: Sustained.
> Mr. Milton: It's the government's job to investigate—
> The Court: Jury understands that an individual is not required to discuss these matters under conditions such as described by counsel.
> Government:
> Q. And you're not required, correct, Mr. Allison?
> A. To talk to the FBI?
> Q. Right.
> A. No.
> Q. Okay. And you also elected not to say anything in front of the FBI until you hit the stand. Is that correct?
> Mr. Milton: Your Honor, I'm going to object.
> The Court: Sustained. It's repetitious.

4. That this was not an unreasonable inference is evidenced by the trial court's comments at sentencing:

> "I couldn't believe your testimony when you got on the stand. I don't think your attorney believed it ... Obviously the jury didn't believe it ... all this kind of absolute rubbish, just insults a person's intelligence." Sent. Tr. at 12.

tion for a continuance made on the morning of the trial. This was defendant's third motion for a continuance based on the same grounds, the death of defendant's accountant and defendant's need to comb his financial records. The court had granted the first two.

The court rejected defendant's third claim that he needed more time to inspect his stored documents based on the "awkward timing" of his request and his prior lack of diligence. Defendant did not begin seeking the documents until two months after his indictment and failed to appear and obtain them after he reached an agreement with the warehouseman regarding unpaid storage fees. Moreover, the defendant had three months since his indictment during which he could have subpoenaed the documents if paying the fees was not possible.

As to the death of defendant's accountant, Mr. Oenes, three weeks prior to trial, the district court noted that a further continuance would not resurrect Oenes or his potential testimony which presumably had not been preserved. Defendant counters that Oenes was to serve as an expert as well as a fact witness and that he needed further time to engage another expert. Beyond the fact that this was the purported reason for the first continuance granted by the court on March 12, it is difficult to fathom what Oenes could have testified to as an expert having surrendered his CPA license to Wisconsin authorities in May 1991, almost a year prior to the trial. The district court did not abuse its discretion in denying defendant's motion for a continuance under these circumstances.

## IV. Ineffective assistance of counsel

Finally, defendant claims that he was deprived of effective assistance of counsel based on (1) his lawyer's failure to object to the government's comments during closing argument, and (2) his lawyer's comment during his own closing in which he allegedly undermined defendant's claim of innocence.

■ "The defendant bears a heavy burden in establishing an ineffective assistance of counsel claim." *United States v. Moya–Gomez*, 860 F.2d 706, 763 (7th Cir.1988),

certiorari denied, 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571. A defendant, like Allison, who raises an ineffectiveness claim on direct appeal without supplementing the record faces "an uphill fight. When the only record on which a claim of ineffective assistance is based is the trial record, every indulgence will be given to the possibility that a seeming lapse or error by defense counsel was in fact a tactical move, flawed only in hindsight." *United States v. Taglia*, 922 F.2d 413, 417–18 (7th Cir.1991). To succeed on his claim, defendant must show both that his counsel's performance was objectively inadequate and that the deficiencies prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

■ We have already held that the government's comments during closing argument on defendant's questionable veracity and failure to speak with the FBI were not improper. Counsel, therefore, was not ineffective in failing to object to them. The government's more inflammatory statement in rebuttal did cross the line of propriety but was harmless in light of all the evidence. Counsel's failure to object to a single improper statement does not establish objective deficiency, particularly where it may have been sound trial strategy to let the comment pass rather than draw additional attention to it and defendant's obvious credibility problems.

■ Allison also claims that his lawyer gave away the farm in his own closing, essentially admitting Allison's guilt when he said:

Reason I got up and said this defendant don't have to talk to this FBI agent or anybody else, he has a constitutional right not to talk to him. It's important. 6th Amendment, 5th Amendment rights. And I respect Agent Aziere. I think he's conducted himself admirably. But Mr. Allison, you, or nobody else have to talk to him, particularly if you felt you've done something wrong.

Def.Br. 22–23. We do not agree that this statement constitutes an unauthorized admission. Counsel was, perhaps somewhat lamely, arguing that neither Allison, the jurors nor any other American has a duty to speak to the FBI and that the absence of such a duty is of constitutional dimension and ex-

tends even to those who may believe that they have done something wrong. The statement does not directly imply that Allison was in the latter category. Given the defense's central theme that Allison always believed that all his actions were legitimate and that he himself was the dupe of his partner, Paul Stafford, the jury could not have considered this single unartful statement in closing as a last-minute admission of guilt.

Neither this single statement nor counsel's failure to object to the government's comment during rebuttal rendered his performance objectively deficient. Moreover, these two alleged failings weighed against the strength of the government's case give us "no reason to believe that the trial would have come out differently." *United States v. Kamel*, 965 F.2d 484, 499 (7th Cir.1992). Defendant, therefore, has failed as well to establish the required prejudice.

Defendant's conviction is affirmed.