[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 22, 2006
THOMAS K. KAHN
CLERK

No. 05-11924

D. C. Docket No. 04-00001 CR-WLS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL AARON O'KEEFE,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Georgia

**(August 22, 2006)**

Before DUBINA, MARCUS and PRYOR, Circuit Judges.

DUBINA, Circuit Judge:

Appellant Michael Aaron O'Keefe ("O'Keefe") appeals his convictions for receipt, advertisement, and possession of child pornography, in violation of 18 U.S.C. §§ 2251(c)(1)(A) and (d), and 2252(a)(2), (a)(4)(B), and (b)(1). O'Keefe argues that his convictions should be reversed because the government improperly used his post-arrest silence for impeachment purposes in violation of his Fifth Amendment right to due process under *Doyle v. Ohio*, 426 U.S. 610 (1976), and engaged in prosecutorial misconduct. For the reasons set forth below, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

*A. Factual Background*

O'Keefe, a math teacher at Lee County High School in Albany, Georgia, designed two internet web sites entitled "hctweens[1]" and "modelquest" which contained pornographic images of children. O'Keefe created the "modelquest" site in August 2000 and the "hctweens" site on December 18, 2002. On the "hctweens" web site, O'Keefe created a questionnaire using code words which asked the visitors their sexual preferences as to age and sexual activity. On the "hctweens" web site, O'Keefe required visitors to identify themselves and submit

---

[1]"Hc" is an abbreviation for "hard core" and "tweens" is a reference to a person under the age of thirteen. (R. Vol. 8 at 61.)

"hard core images" through email.[2]  Six days after the "hctweens" site was created, Homeland Security Agent Matt Goward ("Goward") discovered the site.  Six days thereafter, the site was shut down by its server.  Despite its short existence, during the twelve days that the site was in operation individuals solicited and exchanged child pornography through the site and 127 illegal child pornography images were placed on the site.

In May 2003, O'Keefe began posing as two young girls, ages twelve and thirteen, on the internet.  In this capacity, O'Keefe posted messages on web site groups and sent photographs of two young girls, which he had downloaded from another web site, to male suitors in an effort to arrange meetings with the men.  O'Keefe asked these individuals to send him images of young girls, ages eleven through thirteen, engaged in sexual acts with older men.

On June 4, 2003, law enforcement agents executed a search warrant on O'Keefe's residence, seizing his computer and a floppy disk containing pornographic files.  Thereafter, on May 27, 2004, O'Keefe was charged in a four count superseding indictment with receipt, possession, and advertising of child

---

[2]To join the "hctweens" web site, O'Keefe requested "3 JPEG or BMP images" of "only LG's [little girls] and . . . only HC [hard core].  HC means VS [vaginal sex], AS [anal sex], or OS [oral sex] shots.  Requirement 5-12 [five to twelve year-olds]."  (R. Vol. 8 at 61, 62.)

pornography.[3]  O'Keefe pleaded not guilty to the indictment and the case

proceeded to trial.

*B.  Trial Record*

O'Keefe's primary trial defense was that he was actually an anti-child

pornography crusader who developed internet web sites to entrap child predators

in order to turn their identities over to law enforcement authorities.[4]  According to

O'Keefe, his crusading efforts were thwarted when the web sites were hacked into

and altered by computer viruses to include pornographic images of children.

At trial, the government first broached the subject of O'Keefe's silence

when it asked Homeland Security Agent Cory Brant ("Brant"), the case agent for

O'Keefe's case, about his knowledge of O'Keefe working "as an undercover

vigilante to expose child pornography on the internet." (R. Vol. 9 at 95.)  Without

objection from O'Keefe's counsel, Brant responded that he first learned of

---

[3]Specifically, O'Keefe was charged with one count of receipt of child pornography, one count of publishing notice or advertisement for child pornography, and two counts of possession of child pornography.

[4]O'Keefe also raised the affirmative defense set forth in 18 U.S.C. § 2252A(d), which applies when a defendant

> (1) possessed less than three images of child pornography; and (2) promptly and in good faith, and without retaining or allowing any person, other than a law enforcement agency, to access any image or copy thereof– (A) took reasonable steps to destroy each such image; or (B) reported the matter to a law enforcement agency and afforded that agency access to each such image.

This defense only applies to charges for possession of child pornography.

O'Keefe's defense during O'Keefe's opening statement. (R. Vol. 9 at 95-96.) Brant also testified that he seized a computer and several compact discs, zip disks, and floppy disks from O'Keefe's house, and a computer from the high school where O'Keefe worked. (*Id*. at 100, 108; Vol. 12 at 166.)

James Fottrell ("Fottrell"), a manager of the High Technology Investigative Unit within the Child Exploitation and Obscenity Section of the Department of Justice, testified for the government as an expert witness in computer forensics. (R. Vol. 10 at 51-52, 69.) Fottrell testified that, during his investigation of O'Keefe's computer, he performed a virus analysis on O'Keefe's hard drive. (R. Vol. 11 at 63.) Fottrell stated that he found two viruses on O'Keefe's computer that were only capable of replacing the default homepage of the web browser with a homepage that O'Keefe did not select. (*Id*. at 65-66.) Fottrell further testified that the two viruses he found on O'Keefe's computer were not capable of "downloading and uploading child pornography and sending out advertisements." (*Id*. at 67.)

During the trial, O'Keefe testified in his own defense. On direct examination, O'Keefe testified that he began gathering evidence against child predators on the internet because of an incident involving a family member in 1990. (R. Vol. 12 at 127.) O'Keefe stated that he had participated in anti-child

pornography web sites and reported information to the police anonymously, but was dissatisfied with the response. (*Id*. at 134, 137.) As a result, O'Keefe decided to begin a personal crusade against child predators and began associating with others who were interested in trying to rid the internet of child pornography. He later developed web sites in an attempt to attract these predators so that he and his associates could eliminate child pornography on the internet. (*Id*. at 131, 137, 139.) O'Keefe claimed that the other individuals with whom he worked in developing the web sites also had access to the sites. (*Id*. at 143-44.) O'Keefe acknowledged that he created the "hctweens" web site and survey with the intent of eliciting "hard core images" from pornographers through e-mail. (*Id*. at 154-56.) O'Keefe stated that he intended to transmit the information received from the "hctweens" web site to the Anti-Child Porn Organization. (*Id*. at 156.) O'Keefe further stated that he had previously reported anonymously to the Anti-Child Porn Organization who in turn reports to law enforcement. (*Id*. at 192.)

On cross-examination, O'Keefe testified that he wrote a survey containing sexually explicit questions involving children and posted the survey on one of his web sites. (*Id*. at 167-69.) O'Keefe also acknowledged that a web site containing child pornography stories was on his computer, as well as pornographic pictures that involved children, but he maintained that he did not recall viewing the stories

6

or pictures.  (*Id*. at 169-81.)  O'Keefe further testified that he saved pornographic images on the floppy disks, but did not know that the images involved pictures of children.  (*Id*. at 162-63.)

The government then raised the subject of O'Keefe's silence with O'Keefe during his cross-examination:

A: . . . [T]he computer was seized on June 4th by [Brant] and others from your house?
Q: Yes.
A: All right.  And at no point did you ever tell [Brant] that you were a vigilante or private citizen?

(*Id*. at 185-86.)  Before O'Keefe could answer the question, his counsel objected and the following colloquy ensued:

Court: What is the objection?
Defense: [O'Keefe] does – [O'Keefe]'s going to be read his rights. He has no obligation to tell [Brant] or any other agent anything.  And I object to his commentary on whether anything was or was not said.
Court: What do you mean?
Government: It is noncustodial, Your Honor.  It has nothing. [sic]
Court: What is the objection?
Defense: The objection is that [O'Keefe] has no obligation to make a statement and the commentary is that he didn't make a statement.
 Court: Well.  Fine.  That is correct.  He doesn't have to make a statement, so what is the question?
 . . .
Defense: It is objectionable for [the government] to ask [O'Keefe] what statements he made or didn't tell this person that.  That is objectionable and I object to it.

(*Id*. at 185-86.)  The court overruled the objection and stated that O'Keefe "does not have to say anything, but he cannot not be asked whether he did or didn't." (*Id*.)

The government continued its cross-examination, and O'Keefe admitted that he never told Brant on the day of the search or any time thereafter that he was a private citizen trying to expose child pornography.  (*Id*.)  O'Keefe also admitted that he never told anyone at the Department of Homeland Security, the Federal Bureau of Investigation, nor the National Center for Missing and Exploited Children about his vigilantism.  (*Id*. at 186-88.)  The court then gave the jury a limiting instruction, advising them that

> [A] defendant or a suspect has no obligation to volunteer questions - - I mean answers to questions, and in some situations may have a right not to make a statement.  The Court is allowing this cross examination because of the - - because of the facts asserted and testified to by the defendant on direct.  So since that's a matter he talked about, he can be questioned about what he did or may not have done in that regard.  But that's not to be confused with an obligation as if that means there's a - - some legal accountability because he did or did not.

(*Id*. at 188.)  The cross-examination then continued and O'Keefe admitted that he did not report his activities to the Georgia Bureau of Investigation nor any other law enforcement agent.  (*Id*. at 188-89.)

8

On redirect examination, O'Keefe further testified that he never had the opportunity to pass any information to law enforcement with regard to child predators because one of his web sites "went crazy" and he did not want anything further to do with it. (R. Vol. 13 at 29.) The court then gave another limiting instruction to the jury concerning O'Keefe's testimony:

> Ladies and gentlemen . . . the Court in an abundance of caution wants to give you an instruction . . . . [I]t is a defense to the charge of possession of child pornography if, to the best of the defendant's knowledge, at the time of the possession, he had possessed less than three matters containing any prohibited visual depiction and that promptly and in good faith, and without retaining or allowing any person other than a law enforcement agency, to access any such visual image or a copy thereof, one, he either took reasonable steps to destroy each such visual depiction or reported the matter to . . . a law enforcement agency and afforded the agency access to each such visual depiction. So that's an affirmative defense that's being discussed. There's certain things - - if there's a certain limited number of alleged visual depictions and steps are taken to destroy them or to report it to a law enforcement agency, that's the . . . defense that the Court will describe to you and . . . you determine on the facts whether or not there are facts that satisfy you that that [sic] was the case and would be a defense in the case. So that's the context when the Court was discussing about whether something was reported to a third-party or some alleged intermediary as opposed to law enforcement.

(*Id*. at 34-35.)

O'Keefe called Jeff Fischbach ("Fischbach") as an expert witness in the area of computer and digital media forensics. (*Id*. at 38, 44.) Fischbach testified that

9

the defense counsel had retained him to conduct a forensic examination of the computer media involved in O'Keefe's case. (*Id*. at 54.) In describing his typical process of examination in a case like O'Keefe's, Fischbach stated that

> defense counsel will give us a set of stated goals in terms of trying to demonstrate something or eliminate something as a possibility, and then we will work from - - from those goals. Very typically we will be in essence spoon fed various items that need to be examined and then examine those items again with the understanding that law enforcement themselves have already done a more broad examination.

(*Id.* at 53-54.) Fischbach testified, however, that he is not guided in any way by defense counsel when conducting his examinations. (*Id*. at 54.) Fischbach further testified that he searched for the presence of a Trojan virus on O'Keefe's computer because the events on the computer did not appear to be consistent with a single user. (*Id*. at 112.) Fischbach stated that he found suggestions of a Trojan virus on O'Keefe's computer, which would have allowed another user to control the computer by remote and give the appearance that the computer's owner performed actions on the computer that the owner actually did not perform. (*Id*. at 112, 116-17.) On cross-examination, Fischbach testified that he did not "find a specific Trojan virus" on O'Keefe's computer, but rather he found "only indications of a certain type of virus" and, if there was a virus, it had already been removed. (*Id*. at 150.)

Both parties then rested their cases and the court issued its jury instructions. Among other instructions, the court instructed the jury that

> [Y]ou must consider only the evidence that I have admitted in the case. The term evidence includes the testimony of the witnesses and the exhibits admitted in the record. Remember that anything that the lawyers say is not evidence in the case. It is your own recollection and interpretation of the evidence that controls. What the lawyers say is not binding upon you.

(R. Vol. 14 at 10.) The trial proceeded with the government's closing argument, wherein the government argued that O'Keefe was present when the search warrant was executed at his residence and

> yet he never mention[ed] to [Brant] that he is in fact a vigilante assisting [Brant] in law enforcement in tracking down and stopping child pornography. Never mentions it. In fact, the defense waits until the first day of trial to tell anyone in law enforcement of their defense. Are those the actions of someone that is truthful? Are those the actions of someone that is really trying to help law enforcement or is it a cheap stunt pulled at the last minute by a defense team desperate to get acquittal at any cost?

(*Id*. at 31-32.) The government further argued that "[t]he defense explanations are far[-]fetched, hypothetical theories . . . . As their expert admitted, not on cross[-]examination, but on direct when [O'Keefe's counsel] was asking him, he was spoon-fed, and then he sat here on the stand and regurgitated his spoon-fed theories." (*Id*. at 43.)

11

During the closing arguments, O'Keefe's counsel informed the jury that O'Keefe's defense "has nothing to do with being a vigilante . . . . Our position is everything [O'Keefe] did in his quest to end pedophilia and child pornography on the Internet was legal." (R. Vol. 16 at 2-3.) The government then presented its rebuttal argument, stating

> There's no evidence [O'Keefe] ever did anything to help law enforcement. And, yet, when Special Agent Brant showed up in his house . . . he had nothing to say. Nothing to say. Didn't say thank God you are here, I am one of you, I am a good guy, I have been looking at these sites, I have been tracking them down. No. Never said it. The first time we ever heard about that . . . was in court after the trial had started where he put on his sham make-believe vigilante defense on helping law enforcement . . . . Again, the defenses sprout up like mushrooms and none of them make any sense . . . . When the facts are against them. The law is against them. When both the facts and the law are against you, as a defense attorney, you make something up. . . . You make up the Trojan horse virus.

(R. Vol. 14 at 47, 48.) At that point, O'Keefe's counsel raised an objection, arguing that it was improper for the government to suggest that he fabricated a defense. (*Id*. at 49.) Without ruling on the objection, the court then provided the jury with a curative instruction, stating

> [Y]ou need to make your decision based on the evidence, as I told you before, and counsel is not responsible for bringing this case with the defense. There's no burden on the defense. The burden is upon the government to prove the defendant's guilt beyond a reasonable doubt. So, as I said earlier, counsel's comments are simply just not evidence. So just be reminded of that.

12

(*Id.*)  The government proceeded with its argument, asserting that the defense "certainly spoon-fed their expert." (*Id.* at 49.)  The closing arguments then concluded.

After deliberations, the jury found O'Keefe guilty on all counts of the indictment.  The district court sentenced O'Keefe to 210 months imprisonment and O'Keefe immediately perfected this appeal.

## II.  ISSUES

O'Keefe raises the following two issues on appeal: (1) whether the government violated his Fifth Amendment right to remain silent by eliciting testimony on, and making arguments about, O'Keefe's failure to report his anti-child pornography activities to law enforcement; and (2) whether the government engaged in prosecutorial misconduct during its closing argument.

## III.  DISCUSSION

*A.    Fifth Amendment Violation*

O'Keefe asserts that the government, by its repeated questions to Brant and O'Keefe regarding whether O'Keefe had informed law enforcement of his plan to identify child predators, made impermissible comments in violation of the Fifth Amendment on O'Keefe's decision to remain silent prior to trial.  O'Keefe admits that, under *Doyle v. Ohio*, 426 U.S. 610 (1976), a prosecutor is permitted to

13

comment on a defendant's pre-arrest silence, but argues that a *Doyle* violation

occurred here because it was the government's intent to comment on O'Keefe's

post-arrest silence to suggest guilt and impeach his testimony.

In *Doyle*, the Supreme Court held that "the use for impeachment purposes of

[a defendant's] silence, at the time of arrest and after receiving *Miranda*[5]

warnings, violate[s] the Due Process Clause of the Fourteenth Amendment."

*Doyle*, 426 U.S. at 619.[6]  The Court gave two reasons for its holding.  First, a

defendant's silence has low probative value because it is "insolubly ambiguous."

426 U.S. at 617.  Second, the *Miranda* warnings should not be read to impose a

hidden penalty on one who chooses to rely on them.

> [W]hile it is true that the *Miranda* warnings contain no express
> assurance that silence will carry no penalty, such assurance is implicit
> to any person who receives the warnings.  In such circumstances, it
> would be fundamentally unfair and a deprivation of due process to
> allow the arrested person's silence to be used to impeach an
> explanation [of the crime] subsequently offered at trial.

*Id*. at 618.  Thus, *"Doyle* and its progeny, *see, e.g., Fletcher v. Weir*, 455 U.S. 603

(1982) and *Jenkins v. Anderson*, 447 U.S. 231 (1980), mandate that a defendant's

exculpatory testimony cannot be impeached by his post-*Miranda* silence on the

---

[5]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[6]Although *Doyle* involved a state prosecution and due process guarantees under the Fourteenth Amendment, it also applies to federal prosecutions under the Fifth Amendment.  *See generally United States v. Tenorio*, 69 F.3d 1103, 1106 (11th Cir. 1995).

ground that he did not give an explanation for his conduct at the time of arrest." *United States v. Tenorio*, 69 F.3d 1103, 1106 (11th Cir. 1995) (internal citation omitted).

Generally, we review issues of constitutional law *de novo*. *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004). When a *Doyle* violation occurs, we review the government's use of the defendant's post-*Miranda* silence for harmless error. *Tenorio*, 69 F.3d at 1106 ("When the use of a defendant's silence results in a constitutional violation, the conviction can stand only if the reviewing court is satisfied beyond a reasonable doubt that the error was harmless."). However, "[b]efore reaching the question whether the harmless-error standard applies, we must be satisfied that an error of constitutional dimension occurred." *Greer v. Miller*, 483 U.S. 756, 761 n.3 (1987).

Here, the record does not support that a *Doyle* violation occurred. First, O'Keefe's reliance on *Doyle* is misplaced because there is no evidence that he was ever arrested or given his *Miranda* warnings. The due process considerations addressed in *Doyle* are only implicated by the giving of a *Miranda*[7] warning.

---

[7]"Prior to any questioning, the [defendant] must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. at 444.

15

*Fletcher*, 455 U.S. at 607. As we have recognized, in *Fletcher*, the Supreme Court "refined *Doyle* by making plain that arrest alone is not sufficient to implicate due process considerations; only the giving of a *Miranda* warning or an equivalent affirmative assurance raises a fundamental fairness issue." *United States v. Magdaniel-Mora*, 746 F.2d 715, 723 (11th Cir. 1984); *see United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991) (holding that government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings). Because this fundamental fairness issue derives from the implicit assurance of the *Miranda* warnings, due process is not violated by the use for impeachment purposes of a defendant's silence prior to arrest, or after arrest if no *Miranda* warnings are given. *Brecht v. Abrahamson*, 507 U.S. 619, 628 (1993).

Although this court has not previously addressed the issue of a *Doyle* violation in the absence of *Miranda* warnings, other circuits have had occasion to evaluate *Doyle* error in such circumstances. *See, e.g., United States v. Cummiskey*, 728 F.2d 200 (3d Cir. 1984); *United States v. Allison*, 59 F.3d 625 (7th Cir. 1995). We find the Seventh's Circuit opinion in *Allison* to be particularly instructive in this regard. 59 F.3d at 627-28. Although the FBI contacted the *Allison* defendant twice to discuss his financial dealings, the defendant ignored the requests and

16

never met with the FBI. *Id*. at 627. At trial, the defendant testified that his dealings were legitimate so the government questioned him about his refusal to meet with the FBI in order to impeach his testimony. *Id*. On appeal, the defendant argued that the government's references during cross-examination and closing argument to his refusal to meet with the FBI violated due process under *Doyle*. *Id*. The Seventh Circuit concluded that no *Doyle* or due process violation occurred because the defendant was not taken into custody, interviewed by the FBI prior to trial, nor given *Miranda* warnings. *Id*.

Here, the record does not reveal whether O'Keefe was ever read his *Miranda* rights. The record is clear that O'Keefe was not arrested nor given *Miranda* warnings when Brant executed the search of O'Keefe's residence.[8] Hence, there was no *Doyle* violation at trial when Brant was questioned, and O'Keefe was cross-examined, about O'Keefe's silence during the execution of the search warrant. *See Jenkins*, 447 U.S. at 240 (inquiry into pre-arrest silence is permitted because no governmental action has induced the defendant to remain silent). Additionally, there is no indication in the record that O'Keefe was ever taken into custody or interviewed by law enforcement before trial, so there was no

---

[8]Brant testified at trial that he spoke to O'Keefe during the search of O'Keefe's residence, but indicated that his communication with O'Keefe was limited because O'Keefe was represented by counsel. (R. Vol. 9 at 114, 120.)

occasion at which a *Miranda* warning would have been given.  Although O'Keefe argues that he probably received *Miranda* warnings during his arraignment hearing, he has failed to point us to any portion of the record which indicates that this is true.  Our thorough review of the record establishes that the record is silent as to whether the *Miranda* warnings were given to O'Keefe during his arraignment hearing.[9]  Because there can be no *Doyle* violation until after a person is given *Miranda* warnings and the assurances implicit therein, and there is no evidence before us which indicates that O'Keefe received such warnings, we conclude that no *Doyle* violation occurred in this case.  *See Allison*, 59 F.3d at 627-28.

Second, even if we assume for the sake of this decision that O'Keefe received his *Miranda* warnings during his arraignment hearing, O'Keefe's assertion of reversible error under *Doyle* still misses the mark because he failed to properly raise a *Doyle* objection.  O'Keefe asserts that a *Doyle* violation occurred on three occasions at trial: (1) during Brant's testimony that he first learned of O'Keefe's vigilante defense during the opening statements; (2) during the government's cross-examination of O'Keefe; and (3) during the government's

---

[9]Though the record indicates that O'Keefe was apprised of his constitutional rights during the arraignment, it is unclear which specific rights were discussed in the hearing.  Typically, defendants are not informed of their right to remain silent during such a hearing because the judge does not engage in any questioning of the defendant during the proceeding.  Absent evidence that this specific right was discussed with O'Keefe during his arraignment hearing, we cannot say that he received the necessary warnings about his silence to trigger *Doyle* protection.

rebuttal closing argument. O'Keefe's counsel did not voice an objection to the introduction of Brant's testimony nor to the government's rebuttal closing argument addressing O'Keefe's failure to tell law enforcement about his vigilantism prior to trial. O'Keefe's counsel did, however, object during the government's cross-examination of O'Keefe inquiring into what statements O'Keefe made or failed to make to Brant. Although O'Keefe did not raise an objection directly under *Doyle* in the district court, his counsel did object on the grounds that O'Keefe had no obligation to make statements. We conclude that this general objection does not raise a *Doyle* issue and was insufficient to alert the government to the potential *Doyle* problem. *See Allison*, 59 F.3d at 627. The government had no reason to believe that its questioning raised a potential *Doyle* violation because O'Keefe was not arrested nor given *Miranda* warnings. Additionally, the record indicates that the district court was not aware of any potential *Doyle* issue as it overruled O'Keefe's objection, stating that "O'Keefe does not have to say anything, but he cannot not be asked whether he did or didn't." At that point, if an actual *Doyle* issue existed, it was O'Keefe's counsel's

obligation to bring it to the court's attention. *See Allison*, 59 F.3d at 628 (citing Fed. R. Evid. 103(a)(1)).[10]

Third, even if we assume that the necessary *Miranda* warnings were given to O'Keefe and that he raised a proper *Doyle* objection, we would still find no *Doyle* violation. *Doyle* does not prohibit prosecutors from commenting on a defendant's post-*Miranda* silence for *all* purposes. The fact of a post-arrest silence can be used by the prosecutor to contradict a defendant who testified to an exculpatory version of events and claims to have told the police the same version upon arrest. *Doyle*, 426 U.S. at 619 n.11. "In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest." *Id*.

In *United States v. Fairchild*, 505 F.2d 1378, 1383 (5th Cir. 1975)[11] (cited with approval in *Doyle*), this court held that a prosecutor may question a defendant

_____

[10]Because of the failure to specifically raise the *Doyle* violation, we review O'Keefe's alleged *Doyle* violation for plain error. *See United States v. Campbell*, 223 F.3d 1286, 1288 (11th Cir. 2000). Even if we assume that a *Doyle* violation occurred, O'Keefe failed to show the requisite prejudice to satisfy the plain error standard. *See id*. ("To prevail, [a defendant] must prove three things: (1) an error, (2) that is plain, and (3) that affects substantial rights. In order to 'affect substantial rights,' in most cases, the error must 'have been prejudicial: It must have affected the outcome of the district court proceedings." (citations omitted)). Here, weighing the improper use of O'Keefe's silence against the strength of the government's case, we find no reason to believe that the outcome of the trial would have been different.

[11]In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir. 1981) (en banc), this court adopted as binding precedent the decisions of the former Fifth Circuit issued before October 1, 1981.

20

about his post-arrest silence for the purpose of rebutting the impression that he cooperated with law enforcement authorities. *See also Chapman v. United States*, 547 F.2d 1240, 1243 n.6 (5th Cir. 1977) (stating that *Fairchild* "clearly survive[s] *Doyle*"). The record shows that the government's inquiries into O'Keefe's post-*Miranda* silence[12] were for the purpose of rebutting his claim that he had the intent to cooperate with law enforcement all along and was, in essence, working with law enforcement in the fight against internet child predators. "When a defendant attempts to convince a jury that he was of a cooperative spirit, *Doyle* does not tie the hands of prosecutors who attempt to rebut this presentation by pointing to a lack of cooperation." *United States v. Reveles*, 190 F.3d 678, 685 (5th Cir. 1999). This principle is widely established. *See Earnest v. Dorsey*, 87 F.3d 1123, 1135 (10th Cir. 1996); *United States v. Shue*, 766 F.2d 1122, 1130 (7th Cir. 1985); *United States v. Gant*, 17 F.3d 935, 941-42 (7th Cir. 1994); *McMillan v. Gomez*, 19 F.3d 465, 469-70 (9th Cir. 1994); *Grieco v. Hall*, 641 F.2d 1029, 1033 (1st Cir. 1981). The government's questions on cross-examination were a permissible response to O'Keefe's counsel's inquiry establishing that O'Keefe's purpose for

---

[12]Though it is unclear from the record whether the challenged testimony and commentary implicated O'Keefe's post-*Miranda* silence, it is clear that the government's questions and comments referred to O'Keefe's failure to give a statement to law enforcement at any time prior to trial. As such, assuming that O'Keefe was given his *Miranda* warnings at his arraignment hearing, the challenged testimony and argument, in part, specifically called attention to O'Keefe's post-*Miranda* silence.

21

his conduct was to turn the information over to the police. After O'Keefe's counsel opened the door by this line of questioning, the government properly limited its use of O'Keefe's post-*Miranda* silence to challenge O'Keefe's testimony.

Moreover, the focus of O'Keefe's defense invited questioning of his post-*Miranda* silence. O'Keefe raised the statutory affirmative defense set forth in 18 U.S.C. § 2252A(d), arguing that he was engaging in his conduct and receiving the pornographic images so that he could turn them in to law enforcement. This defense requires the defendant, *inter alia,* to promptly and in good faith report the matter to a law enforcement agency and afford that agency access to the images. *See* 18 U.S.C. § 2252A(d). Having raised the question of his cooperation and reporting of activities to the law enforcement authorities, O'Keefe "opened the door to a full and not just a selective development of that subject" because a defendant cannot "freely and falsely create the impression that he has cooperated with the police when, in fact, he has not." *Fairchild*, 505 F.2d at 1383. "Assuming the law would have excluded from evidence [O'Keefe's] silence had he not broached the subject of cooperation, once he did broach it the bar was lowered and he discarded the shield which the law had created to protect him." *Id*. Once O'Keefe's counsel submitted that O'Keefe was engaging in such conduct with the

22

purpose of turning the information over to law enforcement,[13] it was permissible to allow the government to rebut that inference. Accordingly, we conclude that the evidence of, and argument referring to, O'Keefe's post-*Miranda* silence was admissible for the purpose of rebutting the impression which he attempted to create: that he cooperated fully with the law enforcement authorities. Thus, we find no *Doyle* error in this case.[14]

B.      *Prosecutorial Misconduct*

O'Keefe argues that the government's prosecutorial misconduct during its closing argument resulted in the denial of his right to due process and a fair trial.

---

[13]During the opening statements, O'Keefe's counsel asserted:

> Law enforcement was outmanned. . . . [O'Keefe] felt that law enforcement did not give, for whatever reason, the priority that this kind of conduct deserved. Because you see it is hard to get the evidence. Law enforcement depends on tips, on what citizens report . . . [O'Keefe] learned that there were other people like him who wanted to do something about [child pornography]. . . . They report sites that they have found. And they tell each other and they report to law enforcement, but law enforcement is slow.

(R. Vol. 8 at 9-10.)

[14]We recognize that there is a distinction between the use of silence to impeach the credibility of a defendant regarding his cooperation or lack thereof and the use of silence as evidence of guilt. The former is permissible, while the latter is not. *See United States ex rel. Savory v. Lane,* 832 F.2d 1011, 1017 (7th Cir. 1987) ("[W]here impeachment by silence is permissible, the government may not argue that a defendant's silence is inconsistent with a claim of innocence."). Having scrutinized the record, we are confident that the government's questioning did not emphasize the suggestion of guilt from O'Keefe's silence. Rather, the questioning was centered on rebutting O'Keefe's inference that he made a "prompt or good faith" effort to turn the information over to law enforcement authorities. Additionally, the government's comments in its rebuttal closing argument were also an attempt to rebut the inference that O'Keefe was cooperating with law enforcement.

23

O'Keefe asserts that the government's comment at closing, indicating that O'Keefe's counsel made-up the defense, was an attempt to impute guilt to O'Keefe, and thus violated O'Keefe's due process and fair trial rights. O'Keefe further maintains that the government's comment, submitting that O'Keefe's defense was fabricated by his counsel, was an impermissible expression of the prosecutor's personal opinion. O'Keefe argues that the government's misconduct "permeated the entire atmosphere of the trial" and warrants reversal.

We will reverse a defendant's conviction on the basis of prosecutorial misconduct only where the prosecutor's "remarks (1) were improper and (2) prejudiced the defendant's substantive rights." *United States v. Hernandez*, 145 F.3d 1433, 1438 (11th Cir. 1998); *see also United States v. Abraham*, 386 F.3d 1033, 1036 (11th Cir. 2004) (explaining that prosecutorial misconduct requires a reversal of a defendant's conviction only where the defendant's substantial rights were prejudiced "in the context of the entire trial in light of any curative instruction"). A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the prosecutor's statements, the outcome of the trial would have been different. *See United States v. Hall,* 47 F.3d 1091, 1098 (11th Cir. 1995).

We conclude from the record that the government's remarks in its closing argument, which undoubtedly cast aspersions on defense counsel's integrity, were improper. However, despite these improper comments, we conclude that O'Keeefe has shown no substantial prejudice. *See Hernandez*, 145 F.3d at 1438. The record establishes that the jury had sufficient evidence on which it could find that O'Keefe did receive, possess, and advertise child pornography and that his computer virus defense was false. At trial, O'Keefe admitted that the images of child pornography that the government introduced were found on this computer. (R. Vol. 12 at 169-81.) Further, O'Keefe testifed that he created web sites to attract child predators, that he wrote a survey that contained pornographic questions involving children and posted the survey on one of his web sites, and that he solicited "hard core images" from suspected child predators. (*Id*. at 138-39, 154-56.) Moreover, the government's expert witness, Fottrell, testified that he only found two viruses on O'Keefe's computer, neither of which was capable of "downloading and uploading child pornography and sending out advertisements." (R. Vol. 11 at 65-67.) Considering the evidence in the record, we cannot say that, but for the government's improper remarks, the trial outcome would be different. *See Hall*, 47 F.3d at 1098.

Furthermore, we conclude that the district court's instructions remedied any likely prejudice caused by the improper comments. The court instructed the jury, both before the government's closing argument and after O'Keefe objected to the government's comments, that the arguments were not evidence and that the jury was to decide O'Keefe's guilt based solely on the evidence. (R. Vol. 14 at 10, 49.) *See United States v. Jacoby*, 955 F.2d 1527, 1541 (11th Cir. 1992) ("[B]ecause the statements of counsel are not evidence, the district court may rectify improper prosecutorial statements by instructing the jury that only the evidence in the case is to be considered."). Accordingly, considering the government's improper statements in the context of the trial, we conclude that the statements did not prejudice O'Keefe's substantial rights, and therefore do not require a reversal of O'Keefe's convictions.

## IV. CONCLUSION

For the foregoing reasons, we affirm O' Keefe's convictions.

**AFFIRMED.**