[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-15538

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JAN 16, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-00143-CR-T-24-MAP

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MICHAEL A. ROSIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 16, 2008)**

Before BLACK, HULL and FAY, Circuit Judges.

PER CURIAM:

Appellant Michael Rosin, a former dermatologist, once operated a lucrative dermatology practice in Sarasota, Florida. In 2004, his long-time office manager filed a *qui tam* action, contending Rosin had defrauded the government by performing hundreds of unnecessary surgeries on elderly Medicare patients. Following a government investigation, Rosin was indicted on 35 counts of health care fraud in violation of 18 U.S.C. § 1347, and 35 counts of making false statements in a health care matter in violation of 18 U.S.C. § 1035. Following a 17-day jury trial, Rosin was convicted on all counts and sentenced to 264 months' incarceration, restitution in the amount of $3,697,225.38, and forfeiture in the amount of $3,697,225.38.

Rosin appeals his conviction and sentence on myriad grounds, contending his trial was tainted by improper evidence, prejudicial comments by the judge and prosecutor, and misleading jury instructions. Rosin also challenges the substantive and procedural reasonableness of his sentence and the legality of the court's forfeiture order. Having reviewed the record, we find Rosin's challenges to be largely without foundation. The trial itself was fundamentally fair, and Rosin's sentence was reasonable in all respects. Therefore, we affirm.

2

## I. BACKGROUND

From 1983 to 2004, Rosin was the owner and sole physician of a dermatology clinic and laboratory in Sarasota, Florida. He employed an office manager and lab technicians to assist him in his clinical work.

Rosin was trained to perform a specialized form of dermatological surgery called Mohs surgery. The procedure is designed to minimize scarring during the removal of certain types of skin cancer, and is performed in one or more stages. During each stage, the surgeon removes a thin layer of skin and examines it under a microscope, checking the borders for malignancy and mapping the location of any cancer. If a doctor does not see any malignancy, or determines he has removed the outer edge of the malignancy, he stops cutting or proceeds to another section of the skin where the cancer is located. The goal of surgery is to remove all malignant tissue while minimizing the removal of healthy tissue. The surgery is often performed in only one or two stages, but sometimes requires four or more stages to ensure complete removal of the cancer. Due to the time and expertise the surgery requires, it is costly and not appropriate for all patients.

Approximately 95% of Rosin's patients were elderly Medicare recipients. The federal Medicare program reimburses surgeons for Mohs surgeries at a higher rate than it reimburses for other types of skin cancer removal. The more stages the

surgery requires, the higher the Medicaid reimbursement rate. From September 1998 through May 2005, Rosin performed 5,980 skin biopsies. Of these, he reported that 99.43% revealed cancer. During the same period, Rosin billed Medicare for 4,118 Mohs surgeries. He performed four stages of surgery in 98.93% of these cases.

In February 2004, Carolyn Ferrara, Rosin's office manager, filed a *qui tam* action, alleging Rosin had defrauded the Government by filing false Medicare claims and performing needless surgeries. Her allegations led to an investigation and, ultimately, to the filing of criminal charges against Rosin.

*A. The Trial*

At trial, the jury heard testimony from Rosin, government investigators, character witnesses, numerous medical experts, and a number of Rosin's former employees and patients. The testimony of Rosin's former employees revealed that Rosin's laboratory was staffed by poorly trained lab technicians who prepared biopsy slides that were irregular and often unreadable. Former employees testified they had altered slides on several occasions, in one case replacing skin tissue with gum, and in another, with styrofoam. According to the employees, Rosin diagnosed cancer on both these slides.

4

Rosin denied reviewing slides that contained foreign substances. In addition, he challenged the credibility of his former employees, eliciting uncontroverted evidence that several, including Ferrara, had stolen from him during the course of their employment, and stood to benefit financially from the *qui tam* lawsuit.

The Government called witnesses employed by Florida's Medicare records contractor to testify regarding the general manner in which Medicare claims are processed and to summarize Rosin's billing practice. One of these custodians, Julie Kearn, testified that she had compiled data on all of Rosin's Medicare billings for Mohs surgeries performed from January 2000 to December 2003.

The compiled data was given to Klaus Miescke, a statistician from the University of Illinois at Chicago with experience in health care fraud investigations.

At trial, Miescke testified he used the data Kearns had compiled to select a statistically random sample of 70 surgical slides from which he extrapolated loss findings. The 70 slides Miescke selected were provided to the Government's medical experts, Drs. Pearon Lang and Franklin Flowers, and to Rosin's medical experts for review.

Over Rosin's objection, the Government's experts testified at trial regarding their own surgical practices, rates of cancer diagnosis, and the percentage of four-stage Mohs surgeries each performed, in addition to offering testimony regarding their review of Rosin's slides. Three dermatology experts testified on Rosin's behalf, stating that some of the surgical slides they reviewed had revealed the presence of cancer. Although the experts' testimony differed with respect to which slides revealed evidence of skin cancer, all agreed the slides were of substandard quality and that many were unreadable.

Pathologist Deborah Bir testified regarding the manner in which surgical slides are typically created, stained, and read. She and Lang testified that the poor quality of Rosin's surgical slides was unrelated to the age of the slides or the manner in which they had been stored. The defense countered this testimony by arguing the slides had been readable when they were assembled and had deteriorated due to age, poor assembly, or employee sabotage.

In addition to expert testimony, the jury heard from nine character witnesses, who testified Rosin was an honest, charitable, and trustworthy father, doctor, and community member.

In closing argument, the prosecutor argued Rosin's defense was not credible—that while Rosin claimed to be a caring doctor betrayed by his staff, he

6

was in fact "greedy," and interested only in making money from the Medicare program, as evidenced by the manner in which he carefully recorded patients' financial information, but made and retained little information about their medical history and care. The prosecutor pointed out inconsistencies in Rosin's defense, and called upon jurors to ignore the defense's "attempts to confuse," calling Rosin's theory of the case "misleading" and "unbelievable."

After being given Eleventh Circuit Pattern Jury Instructions, the jury deliberated for one and a half days before convicting Rosin on all counts.

B. Sentencing

Sentencing began June 6, 2006. After two days of testimony, the court ordered the hearing continued until July 6, 2006. The Government moved to remand Rosin to the custody of the United States Marshals during the recess; the motion was granted.

When sentencing resumed on July 6, 2006, Rosin's lawyer asked the court to order a competency evaluation, alleging Rosin was unable to assist in gathering mitigating evidence for the sentencing proceedings. To show that a competency hearing was reasonably necessary, Rosin called Dr. Hyman Eisenstein, a neuropsychologist and clinical psychologist who testified for five hours regarding

7

tests he had performed and interviews he had conducted with Rosin and Rosin's family.

Eisenstein testified Rosin was an intelligent man who suffered from cognitive deficits as a result of three head injuries, the first of which occurred in the 1960s. Although Eisenstein was unable to provide a formal diagnosis without first conducting brain scans on Rosin, he testified he could not "rule out the possibility" Rosin was suffering from dementia as a result of brain injury. When asked how Rosin's suspected dementia would affect his ability to work with counsel, Eisenstein had no answer except to observe that Rosin appeared more interested in discussing his criminal conviction than in preparing for sentencing.

Eisenstein also testified that Rosin appeared to suffer from an obsessive-compulsive disorder. According to Eisenstein, this was the reason Rosin had insisted on performing four stages of Mohs surgery for almost all of his patients. On the basis of this testimony, counsel moved the court to stay further sentencing proceedings and order a full-scale competency evaluation.

The judge noted Rosin had been articulate on the stand during his jury trial, appeared to understand the pretrial, trial, and early sentencing proceedings, and had not complained about being unable to assist his counsel until the judge ordered him remanded. The judge questioned Eisenstein's reliance on tests

8

administered by other psychologists, and noted Eisenstein was unable to do any more than speculate about the possibility that Rosin *might* suffer some deficits from brain injuries dating back several decades. Finding no reasonable cause to believe Rosin was incompetent to participate in sentencing, the judge denied Rosin's motion for a full competency evaluation and hearing.

When sentencing resumed, Rosin raised several objections to the probation office's guideline calculation. First, Rosin asserted the enhancements for loss amount and victims should be calculated with reference only to the patients whose names were listed in the indictment. He objected to inclusion of approximately 800 patients (and the medical claims relating to those patients) on the ground that evidence about those patients and their surgeries had not been presented to the jury. In addition, Rosin asserted he should not be required to repay the Government or be subject to sentence enhancements for any surgery with respect to which any expert opined that the slide revealed evidence of cancer or was unreadable. The district court rejected Rosin's proposal, crediting Rosin only for surgeries for which the Government's expert, Dr. Flowers, had found evidence of cancer.

After finding Rosin had used sophisticated means in carrying out his crime and had caused serious bodily injury to several of his patients, the judge calculated

9

Rosin's offense level as 38 and his criminal history category as I, yielding a guideline imprisonment range of 235 to 293 months, with a fine range of $25,000 to $250,000 dollars. (The 70 counts on which Rosin was convicted carried a cumulative maximum penalty of 700 years' imprisonment and a $17.5 million fine.) The judge sentenced Rosin to 264 months' incarceration, restitution in the amount of $3,697,225.38,[1] and forfeiture in the amount of $3,697,225.38.

## II. DISCUSSION

On appeal, Rosin raises seven challenges to his conviction and sentence. He contends his trial was tainted because (1) the prosecutor introduced unfairly prejudicial evidence and argument; (2) the trial judge intervened improperly in the proceedings; (3) improper evidence was admitted; and (4) the jury was misled by three erroneous instructions. Rosin contends these errors, both alone and cumulatively, merit reversal of his conviction. In addition, Rosin challenges (5) the district court's failure to hold a full competency hearing; (6) the reasonableness of his within-guideline sentence; and (7) the amount of his court-ordered forfeiture. We address each in turn.

*A. Prosecutorial Misconduct*

---

[1] The court ordered Rosin to pay $3,641,247.79 in restitution to Medicare, $7,111.90 to Aetna (a private insurance company), and $48,865.69 to individual victims.

10

First, Rosin contends he is entitled to a new trial because the Government engaged in misconduct throughout his trial. Although many of Rosin's complaints are generalized, he appears to challenge four types of conduct, contending the Government improperly relied on evidence of his bad character in violation of Fed. R. Evid. 404(a); made inflammatory remarks about him and his counsel during closing argument; vouched for the prosecution's chief investigator; and misrepresented the testimony its expert, Dr. Flowers, would be offering at trial. Rosin did not raise contemporaneous objections to any of the alleged misconduct of which he now complains; therefore, "relief is available to rectify only plain error that is so obvious that failure to correct it would jeopardize the fairness and integrity of the trial." *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (applying plain error standard in context of challenges to prosecutor's closing argument).

### 1. *Character evidence*

Rosin contends the prosecutor violated Fed. R. Evid. 404(a) during opening and closing arguments. Specifically, Rosin takes issue with the following comments made during opening argument:

> The Government is not trying to hold the Defendant accountable for honest mistakes. The evidence will show that the Defendant went through the motions to appear that he cared about his patients, and to

11

appear that he was engaged in the honest, ethical and legal practice of medicine.

But what the evidence will show is that what he really was engaged in was a scheme to defraud the Medicare system by performing medically unjustified and invasive surgeries for the single purpose of making money.

Rosin also objects to the following argument, made during closing:

[T]he evidence in this case has presented two starkly different and irreconcilable pictures of this Defendant. He is either a caring, dedicated physician whose only concern is a devoted interest in the welfare of his patients, or he is a greedy, dishonest individual who is guilty as charged of the offense in the superceding indictment.

. . . .

The first and most sacred duty of a medical doctor, members of the jury, is first to do no harm. And this physician was motivated by the same thing that motivates everyone who lies and who steals. The details of their conduct may differ, but it can be explained quite simply and in one word, greed.

Rosin contends that by pointing to character traits such as greed, the prosecutor invited the jury to judge his character rather than his actions.

Although Rosin has framed his argument as a challenge to the admissibility of character evidence, he is not challenging any *evidence*; rather, he is challenging the propriety of the prosecutor's *argument*. The Government concedes that the prosecutor's remarks were "colorful and perhaps flamboyant," but is quick to point out that rhetoric is not impermissible in the courtroom. *See United States v.*

12

*Smith*, 918 F.2d 1551, 1561 (11th Cir. 1990). The Government insists the prosecutor's remarks were fair commentary on the evidence adduced at trial, particularly with respect to Rosin's honesty.

Even assuming the prosecutor overstepped the bounds of prosecutorial propriety, it cannot be said that the prosecutor's statements constituted plain error when "viewed in the context of the record as a whole." *Bailey*, 123 F.3d at 1400. Even under the less exacting standard applied to review of preserved errors, this Court will reverse a defendant's conviction on the basis of prosecutorial misconduct only where the prosecutor's "remarks (1) were improper *and* (2) prejudiced the defendant's substantive rights." *United States v. O'Keefe*, 461 F.3d 1338, 1350 (11th Cir. 2006) (emphasis added). A defendant's substantive rights are prejudicially affected only when a reasonable probability arises that, but for the prosecutor's statements, the outcome of the trial would have been different. *Id.*

In this case, the jury heard extensive testimony from which it could conclude Rosin was guilty of health care fraud. Over the course of a 17-day trial, any improper comments were limited to a few sentences in opening and closing argument. The jury was instructed before it began deliberating that counsel's arguments were not evidence and that the verdict should be based on the evidence

alone. Looking at the record as a whole, there is no reason to believe the prosecutor's characterization of the evidence during opening or closing arguments prejudicially affected the trial, much less obviously jeopardized its fairness and integrity.

### 2. *Allegedly improper argument*

In addition to challenging the prosecutor's remarks about Rosin's character, Rosin challenges remarks allegedly directed toward his trial counsel. During closing argument, the prosecutor accused "the defense" of "talking out of both sides of their [sic] mouth. Referring collectively to Rosin and his counsel, the prosecutor argued, "They're caught in their own web trying to explain all of the conduct that occurred in the defendant's office, and it is noise because it doesn't make sense." Finally, during his closing rebuttal, the prosecutor stated:

> I understand that it is difficult to believe that a physician, that a medical doctor, would do the things that this defendant is accused of in the superceding indictment, but there are in this world, ladies and gentlemen, doctors who lie and steal, just as there are lawyers who lie and steal, just as there are bankers who lie and steal. There are people in this world who lie and steal.

For reasons that are not entirely clear, Rosin is convinced that, by making these statements, the prosecutor intended to suggest to the jury that defense counsel lied and stole.

14

This Court has held that it is improper to "discredit defense counsel in front of the jury . . . and even subsequent jury instructions aimed at rectifying this error may not ensure that these disparaging remarks have not already deprived the defendant of a fair trial." *United States v. De La Vega*, 913 F.2d 861, 867 (11th Cir. 1990) (citing *United States v. McLain*, 823 F.2d 1457, 1462 (11th Cir. 1987), *overruled on other grounds by United States v. Lane*, 474 U.S. 438, 106 S. Ct. 725 (1986)). Despite the seriousness of such an infraction, the Court has clarified that reversal is only warranted when the entire trial is so replete with errors the defendant was denied a fair trial. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).

Although the prosecutor's remarks about the weakness of Rosin's case came close to crossing the line of propriety, they did not go over the line. In attacking inconsistencies in the defense's theory of the case, the prosecutor was commenting fairly on the evidence adduced at trial, and on Rosin's competing explanations for the irregularities in his laboratory. Although the prosecutor would have been wise to make the point with less invective, taken in context, the remarks were not clearly improper and certainly did not deny Rosin a fair trial.

With regard to the prosecutor's comments about doctors, lawyers, and bankers who "steal and lie," it is clear the prosecutor's comments were no more

15

directed at Rosin's counsel than at the prosecutor himself. The Government was merely suggesting to the jury that successful people sometimes commit crimes. That argument was not improper.

3. *Vouching*

Rosin argues the prosecution improperly vouched for witness Diane New, the Government's chief investigator. Although the argument is not entirely clear, it appears to be this: In the course of investigating Rosin's crime, Agent New signed a probable cause affidavit, upon which a search warrant was issued. At trial, without objection from the defense, the prosecutor admitted the cover sheet from the search warrant, listing each of the items the agents were authorized to retrieve. On that sheet was a notation that read, "Affidavit having been made . . . by Special Agent Diane C. New." Rosin appears to contend that, from the notation, the jury could have inferred a magistrate had credited New's affidavit (or else the warrant would not have issued), and by extension, New's credibility. Rosin argues that, by admitting the cover sheet into evidence, the prosecutor "sent an unfair and constitutionally inappropriate message to the jury of unparalleled and compelling 'proof' of R[osin]'s guilt with the very first witness."

When reviewing a defendant's vouching claim, this Court examines whether (1) the prosecutor placed the prestige of the Government behind the witness by

16

making explicit personal assurances of the witness's credibility, or (2) the prosecutor implicitly vouched for the witness's credibility by implying that evidence not formally presented to the jury supports the witness's testimony. *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1177-1178 (11th Cir. 2006). "The prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury." *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991).

On several occasions during trial the prosecutor made passing reference to the fact that a court had issued a search warrant authorizing a search of Rosin's office. The prosecutor did not connect New to the issuance of that search warrant, or comment on her credibility in any way related to the warrant. Under these circumstances, the introduction of the search warrant cover sheet did not amount to vouching. *Cf. United States v. Newton*, 44 F.3d 913, 921 (11th Cir. 1995) (prosecutor's statement bolstering a key witness's testimony by asserting "a judge, state or federal, is not going to give a . . . law enforcement officer a search warrant to search anybody's house for no reason . . . ," while close to the line, was not improper). The prosecutor did not vouch for the witness; therefore, no error was made.

17

### 4. *Mischaracterization of testimony*

As a final challenge to the Government's conduct at trial, Rosin contends the prosecution misrepresented the evidence Dr. Flowers would present during his trial testimony.[2] Before Dr. Flowers was permitted to testify at trial, the court held a conference outside the presence of the jury. At that conference, the prosecution explained Flowers would testify about his own dermatology practice, including the rates at which he diagnosed skin cancer and performed four stages of Mohs surgery. The prosecutor made the argument that Flowers' proposed testimony was not expert because it was grounded in the doctor's personal experience treating patients.

Rosin raised vigorous objections to the prosecution's position, insisting that, because Flowers had no personal knowledge regarding Rosin's patients, his proposed testimony had to be either expert or irrelevant. Rosin questioned whether Flowers' testimony was admissible under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), and challenged the legitimacy

---

[2] In his opening brief, Rosin asserted in passing the Government had also made a misleading proffer regarding the testimony of expert witness Klaus Miescke. The substance of the argument, which Rosin did not develop in his opening brief and did not mention in his reply, appears to relate to his claim that Miescke's testimony was inadmissible. (See Section C.1, *infra*). There was no discrepancy between the Government's proffer and Miescke's testimony.

18

of permitting Flowers to testify about his own practice for the purpose of inviting comparison between Rosin's and Flowers' practices.

Ultimately, however, the judge had the following exchange with defense counsel:

> Court:   As I understand it, Mr. Kehoe, you have no objection to Dr. Flowers qualifying as an expert witness.
>
> Kehoe:   In all candor, no, Judge.  I do believe that he is one when it comes to this particular area . . . .
>
> Court:   All right.  When it comes to his testimony and these areas that may be subject to question by the defense, I'll entertain a sidebar if that's necessary.  But, the Court will be governed and—by the case law requiring the Court, as gate keeper, to base its determination on admissibility on the relevance and reliability of the proffered testimony.  So, we'll proceed on that basis.

On appeal, Rosin argues the prosecutor committed misconduct by arguing Flowers was a treating physician who could testify as a fact witness, rather than as the expert witness he clearly was.  That argument is misguided.  The prosecutor made an obvious legal error when she argued Flowers' testimony was admissible as that of a fact witness, rather than an expert.  *Cf.* Fed. R. Evid. 602 ("A witness may not testify to a matter unless . . . the witness has personal knowledge of the matter.").  However, a lawyer may be wrong without committing misconduct. Although the prosecutor erred when she argued Flowers was not an expert, there is

19

no evidence she intended to mislead the court. Her mistake did not prejudice

Rosin in any way, much less compromise the integrity of the trial.[3]

*B. Intervention by the District Court*

Rosin contends the trial court improperly demonstrated bias against him and

lent its weight to the Government's case by engaging in repeated questioning of

witnesses, commenting on the evidence, and frequently interrupting defense

counsel during questioning. Rosin did not object to the court's questions during

trial; therefore, we review for plain error only. *Hanson v. Waller*, 888 F.2d 806,

813 (11th Cir. 1989); *Coats & Clark, Inc. v. Gay*, 755 F.2d 1506, 1511 (11th Cir.

1985).

A defendant is denied a constitutionally fair trial when a judge strays from

neutrality, abandoning his proper role and assuming that of an advocate. *United

States v. Wright*, 392 F.3d 1269, 1274 (11th Cir. 2004); *see also* Fed. R. Evid. 614,

Advisory Committee Note. Even when an objection to judicial conduct has been

preserved, in order to amount to reversible error, a judge's remarks must

demonstrate such pervasive bias and unfairness that they prejudice one of the

parties in the case. *United States v. Verbitskaya*, 406 F.3d 1324, 1337 (11th Cir.

---

[3] Furthermore, the trial court properly found (with Rosin's concession, no less) that Flowers *was* a qualified expert witness.

2005). Put another way, comments made by the district court will cause reversal only when they "excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." *Brough v. Imperial Sterling Ltd.*, 297 F.3d 1172, 1181 (11th Cir. 2002) (internal quotation marks omitted). In determining whether the district court's comments are prejudicial, the court of appeals "must consider the record as a whole and not merely isolated remarks." *Id.* at 1181.

While a defendant is entitled to an impartial judge, it is also "well settled that a federal district judge is not relegated to complete silence and inaction during the course of criminal jury trial." *Wright*, 392 F.3d at 1274 (11th Cir. 2004) (quoting *United States v. Cox*, 664 F.2d 257, 259 (11th Cir. 1981)).

> It is axiomatic . . . "[t]hat the trial judge has a duty to conduct the trial carefully, patiently, and impartially. He must be above even the appearance of being partial to the prosecution." On the other hand, a federal judge is not a mere moderator of proceedings. He is a common law judge having that authority historically exercised by judges in the common law process. He may comment on the evidence, may question witnesses and elicit facts not yet adduced or clarify those presented, and may maintain the pace of the trial by interrupting or cutting off counsel as a matter of discretion.

*Wright*, 392 F.3d at 1274-75 (quoting *Moore v. United States*, 598 F.2d 439, 442 (5th Cir. 1979)).

Rosin's arguments with respect to the district judge are wholly without merit. In his opening brief, Rosin catalogues a number of statements and

21

questions by the trial court he contends were improper. Having examined each, we can say with confidence that in each instance, the court did no more than ask clarifying questions, deter counsel from eliciting irrelevant testimony or testimony that lacked foundation, or prevent witnesses from giving extended testimony on irrelevant points. Although it is true the court did not question the Government's witnesses in the same way it questioned Rosin's, Rosin has not pointed to any conduct by the Government that would have warranted intervention by the court.

*C. Admission of Evidence*

In what is a mirror image to his judicial intervention claim, Rosin contends he was deprived of a fair trial when the district court failed to act *sua sponte* to bar allegedly inadmissible evidence, and restricted the scope of testimony by Rosin's character witnesses. By suggesting the court should have acted *sua sponte*, Rosin concedes he did not seek to bar the evidence he now challenges. When a defendant has not preserved an objection to an evidentiary ruling, we review for plain error. *United States v. Smith*, 459 F.3d 1276, 1296 (11th Cir. 2006).

*1. Miescke's Testimony*

Rosin takes issue with the court's failure to prevent statistician Klaus Miescke from testifying he had been retained by the Government or that he had worked in the past for the United States Attorney's Office on health care fraud

cases. Rosin argues that by stating he had been hired to "extrapolate loss figures," Miescke implied the 75 surgical slides he reviewed were representative of the whole universe of slides from which the random samples had been taken (meaning that in the cases not selected for review, Rosin had performed unnecessary surgeries at the same rate he performed them with respect to the sampled slides). According to Rosin, the district court plainly erred by permitting such testimony.

It is true Miescke invited the jury to infer his sample was a reliable microcosm of Rosin's medical practice. However, it was not error to admit the testimony. Miescke was a statistician whose job it was to obtain a representative random sample of Rosin's Mohs surgeries. From that sample, the Government's medical experts drew their conclusions about the percentage of Rosin's surgical cases that involved actual cancer, and from that sample the Government drew its preliminary loss figures.[4] The point Rosin misses is that there was nothing improper about Miescke's testimony or the inferences to be drawn from it.

At trial, the defense conceded that Miescke was an expert statistician, qualified to perform random sampling.[5] The purpose of statistical sampling is to

---

[4] Before sentencing, the Government asked their expert, Dr. Flowers, to review more than 4,000 slides recovered from Rosin's office. Consequently, the final loss figures were based on a universe of slides that was larger than Miescke's random sample.

[5] In its brief, the Government inexplicably contends Miescke was not an expert because he did not render any expert opinion. Although an expert is permitted to render an opinion, Fed.

23

provide a means of determining the likelihood that a large sample shares characteristics of a smaller sample. *See, e.g.,* Laurens Walker & John Monahan, *Sampling Evidence at the Crossroads*, 80 S. Cal. L. Rev. 969, 973-74 (2007) (denoting random sampling as "a *sine qua non* of scientific research"). Therefore, it surely came as no surprise to the jury that the Government had retained Miescke for the purpose of obtaining a reliable sample and using that sample for various purposes, including the calculation of loss amounts (none of which Miescke revealed) in a case where the defendant was accused of health care fraud.

Rosin asserts the "court had a duty to *sua sponte* strike the testimony, chastise the Government . . . for its disingenuous representation and give a curative instruction to the jury." He is mistaken. Before Miescke testified, the trial judge heard argument from both sides regarding the permissible scope of Miescke's testimony. The Court ruled Miescke could not represent that his sampling was representative of the full breadth of Rosin's medical practice, but held Miescke could represent that his sampling was representative of the data sample he had been provided. Miescke's testimony was consistent with the

R. Evid. 703, 704, he is not *required* to do so, and failure to offer an opinion does not negate an expert's status, *see* Fed. R. Evid. 702. During the Government's proffer and during his testimony, Miescke discussed his specialized training, as well as the methodology he employs in selecting random samples. His specialized knowledge lay outside the province of the jury and rendered him an expert.

court's ruling, did not go beyond the bounds of his expertise, and did not unfairly prejudice Rosin in any way.

With regard to Miescke's testimony regarding his past affiliation with the United States Attorney's Office, Rosin asserts that, by telling the jury that he had worked on health care fraud cases previously, Miescke implied Rosin had committed health care fraud. Since that was the crime with which Rosin was charged, it could hardly have surprised the jury to hear the Government selected a statistician familiar with health care fraud to analyze data relating to Rosin's case. Consequently, Miescke's testimony on that point could not have prejudiced Rosin unfairly.

*2. Testimony of Flowers and Lang*

Next, Rosin contends the district court erred when it allowed Government experts Flowers and Lang to testify about their own surgical practices, inviting the jury to conclude Rosin's practice was fraudulent because the Government's experts diagnosed cancer at much lower rates and performed many fewer four-stage Mohs surgeries than did Rosin. Rosin points to a host of reasons why he believes it was improper to invite a comparison between his practice and the expert witnesses' practices: he was in private practice while they were in academic clinics; he was a solo practitioner, while they were not; his patients were

25

uniformly elderly, while their patients' ages varied; etc. Although Rosin's critiques were excellent fodder for cross-examination, they went to the weight of the evidence and not to its admissibility.

Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." Fed. R. Evid. 401. All relevant evidence is admissible unless it is excluded under law. Fed. R. Evid. 402. The differences between the rates at which the Government's witnesses and Rosin diagnosed cancer and performed multi-stage Mohs surgery did not provide conclusive proof that some of Rosin's surgeries were medically unnecessary and fraudulent. Nevertheless, if the testimony of the expert witnesses was believed, the stark differences between their surgical procedures and outcomes and Rosin's were probative on the question whether Rosin had defrauded the Medicare program by filing false claims.

Rosin is right when he asserts the expert witnesses' testimony was prejudicial, as all evidence of guilt is intended to be. It was not, however, *unfairly* prejudicial in violation of the rules of evidence or Rosin's rights under federal law. The trial court did not err by failing to prevent the experts from testifying about their medical practices.

### 3. *Failure to inform jury of witnesses' expert status*

Rosin contends it was reversible error for the court not to inform the jury that Miescke, Bir, Lang, and Flowers were expert witnesses, and to specify their areas of expertise. Rosin cites no law for the proposition that courts must instruct juries on the scope of an expert's specialized knowledge, and we can think of no reason why they should be required to do so.

At the close of trial, the judge instructed the jury as follows:

> Now, when the knowledge of a technical subject matter might be helpful to the jury, a person having specialized training or experience in that technical field is permitted to state an opinion concerning those technical matters. Merely because such a witness has expressed an opinion, however, does not mean that you must accept that opinion. The same as with any other witness, it is up to you to decide whether to rely upon it.

The judge exercised his gatekeeping responsibilities by ruling on specific evidentiary objections during the trial, thereby preventing the expert witnesses from testifying to matters outside their relevant expertise. Having done so, there was no need for him to specifically identify which witnesses were "expert" and which were not. He properly instructed the jury to weigh the facts themselves, relying on specialized knowledge or testimony only when it was helpful to their deliberations.

### 4. *Mitigating character evidence*

27

Rosin contends the trial court prevented him from fully presenting his defense by limiting his ability to elicit background testimony from his character witnesses, and by limiting the scope of those witnesses' testimony. The transcript tells a different story.

Rosin called a number of witnesses to testify that he was honest, kind, and charitable. In response to Government objections, the trial court ruled:

> A witness may be asked what his opinion is of the truthfulness of the Defendant, and can state that, in his opinion, the Defendant is a truthful person. The other testimony about charitable activities of the Defendant are [sic] not relevant, and I think they should be kept to a minimum.

Although Rosin may have wished to admit more testimony on the point, the trial court properly limited him to presenting evidence relevant to the case.

With respect to Rosin's allegation that the court curtailed his ability to elicit background facts from his witnesses, Rosin has not pointed to any improper interruptions on the part of the trial court. When witness testimony strayed far afield, the court intervened on several occasions to keep the case running smoothly. The court did so in a manner that was respectful and well within its prerogative.[6]

---

[6] *See, e.g.*, Testimony of Mr. Samuel Uretsky, District Court Dkt. #156, at 74:17-75:23 (court directed counsel to "move on" after asking character witness extensive questions about his military service in the 1940s).

## D. Jury Instructions

Rosin next contends the jury instructions on reasonable doubt, character evidence, and good faith misled the jury and therefore necessitate a new trial. His argument fails for two reasons: First, he himself proposed the instructions, and second, they were not erroneous.

As Rosin concedes, the law is clear that when a party invites an error by proposing an instruction he later challenges, or by affirmatively accepting an instruction proposed by an opposing party, this Court is precluded from reviewing the error on appeal. *United States v. Silvestri*, 409 F.3d 1311, 1337 (11th Cir. 2005). That alone is reason for affirming the lower court's instruction. It is not the only reason, however.

In relevant part, the instruction on reasonable doubt stated:

> [W]hile the Government's burden of proof is a strict or heavy burden, it is not necessary that the Defendant's guilt be proved beyond all possible doubt[.] [I]t is only required that the Government's proof exclude any reasonable doubt concerning the Defendant's guilt.

Rosin contends the use of the phrase "only required" minimized the Government's burden of proof. Read in the context of the whole instruction, however, it is clear the phrase to which Rosin objects was included in the instruction to help the jury understand the prosecution's burden. The instruction emphasizes the Government

29

bears a "strict or heavy" burden. At the same time, the instruction guards against a reading of "reasonable doubt" that would require the Government to disprove all possible doubt—a burden higher than the law requires. The instruction is accurate, and it was not error for the district court to charge the jury in the words it did.

Similarly, Rosin's challenge to the instruction on character evidence is without merit. The character evidence instruction stated:

> Now, the Defendant has offered evidence of the Defendant's traits of character and such evidence may give rise to a reasonable doubt. Where a Defendant has offered testimony that the Defendant is an honest and truthful person, the jury should consider that testimony along with all the other evidence in deciding whether the Government has proved beyond a reasonable doubt that the Defendant committed the crimes charged.

The instruction made no mention of testimony regarding the defendant's character for any trait other than truthfulness.

Rosin contends the instruction was flawed because it directed the jury to consider evidence of Rosin's "truthfulness," but did not invite the jury to consider evidence that Rosin was a "caring, compassionate, kind, and charitable" person. Rosin argues that without such an instruction, the jury "likely disregarded all Rosin's other positive character traits" in reaching their verdict. This, he asserts, was error.

Rosin appears to believe his general character for kindness and charity was relevant because the prosecution characterized him as a greedy doctor who was more interested in making money from Medicare than in caring for his patients. That argument betrays a misunderstanding of the role character evidence played in the trial. The jury was not asked to determine whether Rosin was good (honest, kind, etc.) or bad (greedy, cruel, etc.): it was asked to determine whether he defrauded the Medicare system by making false statements and engaging in health care fraud. Insofar as honesty is the opposite of fraudulent misstatement, then Rosin's integrity in requesting payment for necessary surgeries was a legitimate consideration. His general character was not. Nothing about the character instruction was incorrect and there is no reason to believe it misled the jury in any way.

Rosin's challenge to the good faith instruction is only slightly more substantial. As he points out, and the Government concedes, neither the parties nor the district court tailored the pattern instruction to the facts of his case. Specifically, Rosin takes issue with the italicized portion of the instruction below:

> Now, one who expresses an honestly held opinion or an honestly formed belief is not chargeable with fraudulent intent even though the opinion is erroneous or the belief mistaken. And similarly, evidence which establishes only that a person made a mistake in judgment or

an error in management or was careless does not establish fraudulent intent.

On the other hand, *an honest belief on the part of the defendant that a particular business venture was sound* and would ultimately succeed would not in and of itself constitute good faith as that term is used in these instructions if, *in carrying out the venture* the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them.

(Emphasis added.) Rosin argues the fraud with which he was charged was not related to a business venture; therefore, the reference to unsound "business ventures" should have been deleted from the instruction.

Perhaps, but not necessarily. Billing Medicare and other health insurers for surgeries is part of the business of running a medical clinic. Understood in this way, the instruction is accurate. Rosin has not suggested any way the jury would have been mislead in its deliberations by the improper instruction, and none is apparent. There was no error in providing this instruction to the jury.

*E. Cumulative Errors*

Having reviewed the alleged errors of the trial judge and prosecutor individually, the Court must also "review the prejudicial effect of *all . . .* errors, evaluated under both preserved and plain error standards, in the aggregate." *United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005)*; United States v. Blasco*, 702 F.2d 1315, 1329 (11th Cir. 1983) ("A piecemeal review of each

32

incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution.").

In this case, there are no errors to aggregate. Having concluded no substantial errors occurred at trial, there is no more to consider with respect to this claim. *Cf. Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986) ("[T]he Constitution entitles a criminal defendant to a fair trial, not a perfect one.").

## F. Competency Hearing

Next, Rosin contends the district court abused its discretion by failing to order a competency evaluation and hold a hearing on whether Rosin was able to assist his counsel in preparing for sentencing due to brain injuries he had allegedly incurred decades earlier. *See United States v. Nickels*, 324 F.3d 1250, 1251-52 (11th Cir. 2003) (appellate court reviews denial of motion for determination of competency under 18 U.S.C. § 4241 for abuse of discretion).

In determining whether a defendant is competent to be sentenced, the district court must look at evidence indicating "a present inability to assist counsel or understand the charges" against him. *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995). Federal law provides:

33

> At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, or at any time after the commencement of probation or supervised release and prior to the completion of the sentence, the defendant or the attorney for the Government may file a motion for a hearing to determine the mental competency of the defendant. The court shall grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a). Put another way, "[a] district court must conduct a competency hearing when there is a 'bona fide doubt' regarding the defendant's competence." *United States v. Rahim*, 431 F.3d 753, 759 (11th Cir. 2005) (citing *Pate v. Robinson*, 383 U.S. 375, 385, 86 S. Ct. 836, 842 (1966)).

After hearing five hours of testimony from Rosin's expert witness, Dr. Eisenstein, the district court concluded a full blown competency evaluation and hearing was not needed. Although Eisenstein asserted Rosin suffered from cognitive deficits as a result of three head injuries, dating from the 1960s through the present, Eisenstein acknowledged Rosin had above-average intelligence and was unable to say how the alleged deficits affected Rosin's daily life at all, much less to a degree that would interfere with his ability to assist counsel.

In denying the motion for a competency evaluation, the district judge noted Rosin had been articulate on the stand during his jury trial, appeared to understand

34

the pretrial, trial, and early sentencing proceedings, and had at no time prior to his detention made any complaint about being unable to understand what was happening or assist counsel in his defense. The judge reasonably questioned Eisenstein's reliance on tests administered by other psychologists, and noted Eisenstein was unable to do any more than speculate about the possibility Rosin *might* suffer some deficits from brain injuries dating back several decades. Finding no reasonable cause to believe that Rosin was incompetent to participate in sentencing, the judge denied Rosin's motion for additional brain imaging tests and a subsequent competency hearing. His ruling was logical and well-articulated, and was not an abuse of discretion.

*G. Sentencing*

Lastly, Rosin raises challenges to both the duration of his sentence and the lawfulness of the court's forfeiture order. He contends the district court erred in calculating his Guidelines sentence and in failing to vary downward from the guideline range. In addition, Rosin contends the court's forfeiture order violated his rights under the Eighth and Fifth Amendments.

*1. Sentence duration*

Challenges to the duration of a sentence may come in either of two forms: procedural or substantive. Rosin contends the court erred procedurally when it

applied improper sentencing enhancements, and erred substantively when it imposed a sentence longer than needed to achieve the purposes of sentencing.

### a. Guidelines calculation

When reviewing a district court's sentencing decision, this Court "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, [or] failing to consider the § 3553(a) factors . . . ." *Gall v. United States*, — U.S. — , 128 S. Ct. 586, 597 (2007). This Court reviews a sentencing court's application of the Sentencing Guidelines *de novo. United States v. Edmonds*, 348 F.3d 950, 952-53 (11th Cir. 2003).

According to Rosin, the district court miscalculated the applicable guideline range in three ways. First, Rosin contends, the district court violated *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005), by enhancing his sentence based on estimations of the loss amount and the number of victims. The jury did not find these facts to be true beyond a reasonable doubt; therefore, Rosin contends they were improperly used to enhance the severity of his sentence.

This Court explained in *United States v. Rodriguez* that "the use of extra-verdict enhancements in an advisory guidelines system is not unconstitutional." 398 F.3d 1291, 1301 (2005)*; see also United States v. Chau*,

426 F.3d 1318, 1323-24 (11th Cir. 2005) (holding *Booker* does not prohibit district court enhancement based on facts found by a preponderance of the evidence and not charged in the indictment, under an advisory sentencing scheme). So long as the judge views the Guidelines as advisory and finds relevant facts by a preponderance of the evidence, he may rely on facts not before the jury to enhance the sentence. *United States v. Douglas*, 489 F.3d 1117, 1129 (11th Cir. 2007). That is what happened here.

Relying on the testimony of Dr. Flowers (the expert witness who reviewed the greatest number of slides), the court concluded Rosin committed fraud with respect to more than 800 different victims, and the losses associated with those victims exceeded $4 million. The court's reliance on the extra-verdict enhancements was proper and did not violate the Constitution.

Next, Rosin contends the court erred by enhancing his sentence based on his use of sophisticated means. A district court's finding that sophisticated means were used in the commission of a crime is a finding of fact we review for clear error. *United States v. Barakat*, 130 F.3d 1448, 1456 (11th Cir. 1997).

The Sentencing Guidelines provide for a two-level enhancement if an offense involves "sophisticated means." U.S.S.G. § 2B1.1(b)(9)(C) (2006). The commentary on that section states that sophisticated means are:

37

especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operation in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1(b)(9)(C) cmt. n. 8(B).  There is no requirement that each of a defendant's individual actions be sophisticated in order to support imposition of the enhancement; rather, it is sufficient if the totality of the scheme was sophisticated.  *Cf. United States v. Finck*, 407 F.3d 908, 915 (8th Cir. 2005) ("Repetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.").

Rosin contends his scheme to defraud Medicare was not sophisticated because he performed routine surgeries and did not use "complex tactics to cover up his fraud."  However, the evidence adduced at trial revealed Rosin ran a laboratory staffed with poorly trained technicians, directed his staff to discard surgical slides, and performed complicated multistage surgeries in a manner designed to maximize his profits while appearing falsely to treat skin cancer.  Given those facts, the court did not clearly err in finding Rosin's means were "sophisticated" within the meaning of the enhancement.

Thirdly, Rosin contends there was no evidence to support the district court's finding that his patients had suffered serious bodily injury as a result of his criminal activity. Section 2B1.1(b)(12) of the United States Sentencing Guidelines provides a two-level enhancement for crimes involving the "conscious or reckless risk of death or serious bodily injury . . . ." Serious bodily injury is defined as injury "involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, cmt. n.1(L)(2006).

In arguing there was no evidence to justify a finding of serious bodily injury, Rosin misrepresents the facts. After hearing from numerous patients during the sentencing hearing, the judge concluded that at least two had suffered serious physical injuries above and beyond surgery as a result of Rosin's conduct. The judge did not err by enhancing Rosin's guideline range accordingly.

### b. Failure to vary

If a district court's sentencing decision is procedurally sound, the appellate court must "consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." *Gall*, 128 S. Ct. at 597. When conducting

this review, the court must take into account the totality of the circumstances, including the extent of any variance from the guideline range. *Id.*

Rosin contends his sentence was substantively unreasonable because the district court failed to vary downward on the basis of his charitable contributions, his family's need for support, his payment of restitution in full, and his allegedly diminished mental capacity. In both *Gall* and *Rita v. United States*, 551 U.S. —, 127 S. Ct. 2456 (2007), the Supreme Court held that, in reviewing sentences for substantive reasonableness under 18 U.S.C. § 3553(a), federal appellate courts may apply a presumption of reasonableness to district court sentences imposed within the guideline range. *Gall*, 128 S. Ct. at 591; *Rita*, 127 S. Ct. at 2463. Although this Circuit has declined to adopt such a presumption, the Court has acknowledged the rationale in *Rita* "calls into question our reasons for not affording a presumption of reasonableness," *United States v. Campbell*, 491 F.3d 1306, 1314 n. 8 (11th Cir. 2007), and has held that "ordinarily we would expect a sentence within the Guidelines range to be reasonable." *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

In this case, the trial judge listened to multiple days of testimony, hearing evidence from experts, former patients, and members of the community about Rosin's character, his actions, and the effects of his crime. Rosin points to other

cases in which individuals convicted of Medicare fraud received sentences lighter than his. That fact alone is no reason for this court to vacate Rosin's sentence: different defendants often receive different sentences, as the facts of each case require. *See Gall*, 128 S. Ct. at 598 ("It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."). Unless a sentence is grossly disproportionate to the offense committed we do not even consider the sentences imposed on other offenders who have committed similar crimes. *United States v. Arias-Izquierdo*, 449 F.3d 1168, 1186 (11th Cir. 2006).

It is true Rosin received a long sentence; however, it is also true he was found guilty of committing serious crimes that extended over a protracted period. His crimes affected elderly persons, abused a position of trust, and cost the Government millions of dollars. Although Rosin points to mitigating evidence, such as his charitable works and the needs of his wife and children, the district court found those facts insufficient to justify a sentence outside the guideline range. Finding neither mitigating nor aggravating circumstances in Rosin's case,

the district court imposed a sentence in the middle of the guideline range. We cannot say he abused his discretion by doing so.

## 2. *Forfeiture*

Rosin raises two distinct challenges to his forfeiture order. First, he contends that because the court ordered full restitution, the forfeiture order is an excessive fine that violates the Eighth Amendment. Second, Rosin challenges the $490,876.11 difference between the amount of forfeiture sought in the indictment and the amount ordered at sentencing as an impermissible material variance.

### a. *Excessive fine*

When sentencing a defendant convicted of a federal health care offense, district courts are required to "order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense." 18 U.S.C. § 982(a)(7). Rosin does not challenge the court's ability to order him to pay forfeiture, but contends the amount ordered—$3,697,225.38—is excessive, particularly in light of the fact he made full restitution to the Medicare program. Rosin failed to raise his objection to the trial court; therefore, we review for plain error only. *United States v. Raad*, 406 F.3d 1322, 1323 (11th Cir. 2005).

Under the Eighth Amendment, a forfeiture is excessive "if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334, 118 S. Ct. 2028, 2036 (1998). Because excessiveness "is a highly subjective judgment, the courts should be hesitant to substitute their opinion for that of [Congress]." *United States v. 817 N.E. 29th Drive*, 175 F.3d 1304, 1309 (11th Cir. 1999) (citing *Bajakajian*, 524 U.S. at 334, 118 S. Ct. at 2037 ("judgments about the appropriate punishment for an offense belong in the first instance to the legislature")). If the value of forfeited property is within the range of fines prescribed by Congress, a strong presumption arises that the forfeiture is constitutional. *817 N.E. 29th Drive*, 175 F.3d at 1309.

In this case, the maximum fine authorized by statute was $250,000 for each crime Rosin committed. 18 U.S.C. § 3571(b)(3). He was convicted on 70 counts, which led to a maximum fine of $17.5 million dollars. Although the recommended guideline fine was substantially less than that amount ($250,000), given the fact Rosin defrauded the Government of more than $3.6 million, it is difficult to say a forfeiture twice that amount is unconstitutional, particularly in light of the fact that Rosin's net worth exceeded $11 million.

Rosin contends the court should have taken account of his restitution when setting the amount of his forfeiture. While superficially appealing, this argument

43

fails to account for the different goals served by restitution and forfeiture. *See United States v. Leahy*, 464 F.3d 773, 793 n.8 (7th Cir. 2006) ("While we recognize to the untrained eye, this might appear to be a 'double dip,' restitution and forfeiture serve different goals . . . ."). The goal of restitution is to compensate victims for their losses, *see, e.g.,* 18 U.S.C. §§ 3556, 3663(a)(1) (authorizing restitution to compensate victims of criminal offenses), while the goal of forfeiture is to punish, *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999). That a defendant may ultimately be ordered to pay in restitution and forfeiture more than he took is of little consequence:

> [P]aying restitution plus forfeiture at worst forces the offender to disgorge a total amount equal to twice the value of the proceeds of the crime. Given the many tangible and intangible costs of criminal activity, this is in no way disproportionate to the harm inflicted upon government and society by the offense.

*United States v. Various Computers and Computer Equipment*, 82 F.3d 582, 588 (3d Cir. 1996) (quotation marks and brackets omitted).

Although Rosin's forfeiture amount was high, so was the amount by which he defrauded the Government. The forfeiture order did not violate the Excessive Fines Clause of the Eighth Amendment.

### b. Variance

Lastly, Rosin contends his forfeiture order was invalid because there was a material variance between the amount sought in the indictment and the amount the court ordered him to pay. As an initial matter, we question whether the theory of material variance even applies to forfeiture decisions, which implicate a defendant's right to be free from excessive punishment, *see supra*, rather than his right to notice of the charges against him, *United States v. Ratliff-White*, 493 F.3d 812, 819 (7th Cir. 2007) (material variance implicates defendant's Fifth Amendment right to be informed of nature and cause of accusation against him and Sixth Amendment right to indictment by grand jury). The claim that a material variance exists between indictment and proof adduced at trial is a "form of challenge to the sufficiency of the evidence," *United States v. Jenkins*, 779 F.2d 606, 616 (11th Cir. 1986). Rosin does not point to precedent in this Circuit or any other applying the law of material variance to a sentencing, fine, or forfeiture decision, and our independent search has revealed none.

Nevertheless, for the sake of argument, we note "[a] variance exists where the evidence at trial proves facts *different* from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations." *United States v. Gold*, 743 F.2d 800, 813 (11th Cir. 1984). "The standard of review for whether there is a material variance

between the allegations in the indictment and the facts established at trial is twofold:  First, whether a material variance did occur, and, second, whether the defendant suffered substantial prejudice as a result." *United States v. Chastain*, 198 F.3d 1338, 1349 (11th Cir. 1999).

Rosin points out that in the superceding indictment, the Government requested forfeiture in the amount of $3,206,349.21.  However, after the Government's expert testified to a higher loss amount, the court ordered $3,697,225.38 in restitution—a difference of $490,876.11.  The difference between the amount listed in the indictment and the amount Rosin was ordered to pay differed by half a million dollars, a large sum of money, but an amount only 15% greater than the amount requested in the indictment.  Considered in context, it is doubtful the "variance" could be considered "substantial."

Assuming the difference *was* significant enough to qualify as a substantial variation from the amount sought in the indictment, the next question would be whether the difference substantially prejudiced Rosin.  To show that it did, Rosin would be required to demonstrate that "the proof at trial differed so greatly from the charges that [he] was unfairly surprised and was unable to prepare an adequate defense." *United States v. Alred*, 144 F.3d 1405, 1415 (11th Cir. 1998).  Rosin

makes no effort to explain how he was prejudiced by the higher amount proven at sentencing, and it is difficult to see how he would have been.

The court's forfeiture order was equivalent to the amount of money Rosin had received from Medicare, patients, and patients' insurers as a result of the fraudulent surgeries. Rosin's counsel had the opportunity to argue at sentencing that the court had included too many surgeries in assessing the extent of the fraud, and, in fact, he presented competing expert testimony on the point. Although the court ultimately rejected Rosin's argument, he cannot say he was unfairly surprised by the Government's position and was unfairly prejudiced by it. Therefore, even if there could be a material variance between the amount sought in an indictment and the amount ordered forfeited following conviction, Rosin has not shown such a variance existed in this case.

**AFFIRMED.**